IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MORRIS PARRISH,<br><br>    *Plaintiff*,<br><br>  v.<br><br>CORIZON HEALTH, INC., *et al.*,<br><br>    *Defendants*. | CIVIL ACTION<br>No. 15-01813 |

**PAPPERT, J.**                               August 3, 2016

<u>**MEMORANDUM**</u>

  Morris Parrish ("Parrish"), a prisoner at SCI-Graterford ("Graterford"), sued the following Defendants for providing him allegedly inadequate medical treatment: Graterford's Superintendent Michael Wenerowicz ("Wenerowicz"), Graterford's Correctional Healthcare Administrator Joseph Korszniak ("Korszniak"), Corizon Health, Inc. ("Corizon"), Wexford Health Sources Inc. ("Wexford"), Correct Care Solutions ("Correct Care"), Joseph Boggio, M.D. ("Dr. Boggio"), Richard Stefanic, M.D. ("Dr. Stefanic"), Bruce Blatt, M.D. ("Dr. Blatt"), Stephen Wiener, D.O. ("Dr. Wiener"), Felipe Arias, M.D. ("Dr. Arias") and John Does 1–100.[1] Parrish's complaint alleges claims under 42 U.S.C. Section 1983 and Pennsylvania state law. Before the Court are Defendants' motions to dismiss, which the Court denies.

**I.**

  In February 2007 Parrish reported to Graterford medical personnel that he was experiencing blurry vision. (Am. Compl. ¶ 26, ECF No. 27.) Parrish was diagnosed two months later with open-angle glaucoma in both eyes. (*Id.*) With open-angle glaucoma, "the eye's drainage canals become clogged," causing an increase in intraocular pressure ("IOP") and

---

[1]   The parties stipulated that Defendant Scott Hartzell, M.D. ("Dr. Hartzell") would have until August 7, 2016 to respond to the Amended Complaint. The Court's opinion therefore does not address Dr. Hartzell.

1

permanent damage to the optic nerve.  (*Id.* ¶ 27.)  The condition "is treatable but not curable, and must be monitored, managed and treated for life."  (*Id.* ¶ 28.)  Glaucoma patients are typically prescribed eye drops which "decrease IOP by helping eye fluid to drain and/or decreas[e] the amount of fluid made by the eye."  (*Id.* ¶ 29.)  With proper care "the expectation is that the patient will maintain sight and that progressive vision loss will be halted."  (*Id.* ¶ 28.)

From 2007 to 2010 doctors at Graterford prescribed Parrish Xalatan eye drops and conducted periodic ophthalmology appointments.  (*Id.* ¶ 33.)  In February 2010 Parrish was transferred to Green Rock Correctional Center in Chatham, Virginia.  (*Id.* ¶ 34.)  Doctors in Virginia examined Parrish, found that his IOP "was at dangerously high levels" and subsequently transferred him back to Pennsylvania.  (*Id.* ¶ 35.)  Parrish contends that Defendants "were aware or should have been aware of the serious, uncontrolled nature of . . . [his] glaucoma prior to February 2010."  (*Id.* ¶ 36.)

Due to the severity of his condition, Defendants arranged for Parrish to receive treatment from eye specialists at Wills Eye Hospital ("Wills Eye") from June 2010 to March 2011.  (*Id.* ¶¶ 37–38.)  Doctors at Wills Eye started Parrish on a new eye drop regimen, performed laser surgery and "planned to monitor him closely for any increases in IOP."  (*Id.* ¶ 38.)  The plan included "scheduling conventional surgery as soon as his IOP increased to prevent further permanent damage to [Parrish's] vision."  (*Id.*)

Between 2010 and March 2011 "the Defendants failed to follow the instructions given by the specialists [at Wills Eye] on several occasions, leading to delays in medically necessary treatment and periods of time when . . . Parrish was without his medically necessary eye drops." (*Id.* ¶ 39.)  After Parrish's March 2011 appointment, Defendants ended his treatment at Wills Eye "in direct contravention of the plan put in place by the specialists . . . who had directed that . . .

Parrish return in June 2011, and without consulting or notifying anyone at the facility." (*Id.* ¶ 40.) Defendants subsequently "failed to follow the medical treatment plan put in place" by Wills Eye, delayed providing Parrish with refills for his medication and cancelled the "medically necessary prescriptions that had been recommended by the specialists." (*Id.* ¶ 41.) As a result, Parrish's IOP "had increased from 9 to 26 in his right eye by 2013." (*Id.*)

After three-and-a-half years, Defendants took Parrish back to Wills Eye in August 2014. (*Id.* ¶ 43.) Specialists at Wills Eye observed that since Parrish last visited the hospital in 2011, he had suffered from "advanced loss" of vision. (*Id.*) The specialists started Parrish on a new treatment plan and performed another surgery in January 2015. (*Id.* ¶ 44.) Following the surgery Parrish was scheduled for a "critical" follow-up appointment "at which his sutures were to be removed." (*Id.* ¶ 46.) Defendants "failed to arrange for and transport" Parrish to that follow-up appointment, resulting in a two month delay. (*Id.*) Parrish's IOP continues to be high and uncontrolled given Defendants' continued failure to arrange for and transport him to follow-up appointments and provide his medications on a timely basis. (*Id.* ¶¶ 47–48.) Specialists at Wills Eye have been attempting to schedule a revision surgery for Parrish since June 2015, which Defendants continue to refuse. (*Id.* ¶ 48.)

Throughout the relevant time period Parrish made multiple complaints to medical staff and supervisory personnel regarding: (1) the delayed and cancelled appointments; (2) the delays in administering his medication; (3) the cancellation of the medication recommended by Wills Eye; and (4) the failure to follow the Wills Eye treatment plans. (*Id.* ¶ 50.) Parrish contends that the Defendants' "failure to follow the instructions of the specialists . . . and provide appropriate medication and treatment to [him] was based on non-medical considerations, including cost-

cutting, and in deliberate indifference to [his] serious medical needs and the treatment plan put in place by Wills Eye." (*Id.* ¶ 56.)

Parrish filed his original complaint *pro se* on April 10, 2015. (ECF No. 4.) The Court granted Parrish a number of continuances while his case remained listed on the Court's Prisoner Civil Rights Panel. (ECF Nos. 13–16.) The case was reassigned from Judge Restrepo to this Court on January 20, 2016. (ECF No. 17.) Parrish obtained counsel on February 4, 2016. (ECF No. 19.) On February 11, 2016 the Court held a telephone conference with the parties and ordered the Defendants to produce Parrish's medical records and grievances by March 11, 2016. (ECF No. 24.) The Court also ordered Parrish to file his Amended Complaint on or before May 11, 2016. (*Id.*) Parrish timely filed his Amended Complaint (ECF No. 27) and Defendants subsequently filed their motions to dismiss. (ECF Nos. 39, 45, 47–48.) Parrish filed his responses (ECF Nos. 43, 60, 62–63) and Korszniak and Wenerowicz filed a reply. (ECF No. 44.)

**II.**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "mere possibility of misconduct" is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court must construe the complaint in the light most favorable to the plaintiff. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted). A court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). Whether a complaint states

a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

Under *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. *See Connelly*, 809 F.3d at 787. First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

### III.

Parrish asserts a number of claims under 42 U.S.C. Section 1983. To establish a prima facie case under Section 1983, Parrish must first demonstrate that a person acting under color of law deprived him of a federal right. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). None of the parties dispute that the Defendants acted "under color of law" for purposes of a Section 1983 claim. Parrish must also show that the person acting under color of law "intentionally" violated his constitutional rights or acted "deliberately indifferent" in violation of those rights. *See, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 843–44 (1998); *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (citing *Hill v. California*, 401 U.S. 797, 802–05 (1971)); *Berg v. County of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000).

### A.

Parrish alleges that Dr. Boggio, Dr. Stefanic, Dr. Blatt, Dr. Wiener, Dr. Arias and John Does 1–100 ("the Doctors"), along with Wenerowicz and Korszniak ("the DOC Defendants"), were deliberately indifferent to Parrish's serious medical need in violation of the Eighth

Amendment. The Eighth Amendment imposes upon prison officials the duty to ensure that inmates receive adequate food, clothing, shelter and medical care. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833. To establish an Eighth Amendment violation, Parrish must allege: (1) that he has a serious medical need; and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). Neither the Doctors nor the DOC Defendants dispute that Parrish has a serious medical need. Rather, they assert that Parrish fails to allege deliberately indifferent conduct.

**i.**

Prison medical personnel may be found to have acted with deliberate indifference where they "prevent[ed] an inmate from receiving recommended treatment for serious medical needs." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987). Parrish can also establish deliberate indifference by alleging facts showing that the Doctors "den[ied] reasonable requests for medical treatment . . . and such denial expose[d] [him] to undue suffering or the threat of tangible residual injury." *Id.* If the alleged inadequate care "was a result of an error in medical judgment," then Parrish's claims must fail. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). If, however, the failure to provide adequate care was deliberate, and motivated by non-medical factors, then Parrish's claims are actionable.

Parrish sufficiently alleges deliberately indifferent conduct by the Doctors. Parrish asserts that the Doctors were responsible for providing medicine, following treatment plans and ensuring that he timely received his medication. (Am. Compl. ¶¶ 9, 12–13.) Throughout the

complaint, Parrish contends that the Doctors failed to: (1) provide him medication in a timely fashion; (2) arrange for follow up appointments with Wills Eye; and (3) adhere to the treatment plans put into place by Wills Eye. (*Id.* ¶¶ 19–20.)  Parrish contends that the Doctors' failures were precipitated by non-medical considerations such as cost-cutting. (*Id.*)  Parrish ultimately suffered from advanced loss of vision and his IOP remains at an unacceptably dangerous level. (*Id.* ¶¶ 43, 47–48.)  Taking these allegations as true, Parrish alleges facts sufficient to establish that the Doctors were deliberately indifferent to his serious medical needs.

### ii.

Parrish must similarly allege deliberate indifference by the DOC Defendants in their supervisory roles.  The Third Circuit Court of Appeals has provided two possible ways an inmate can establish deliberate indifference by supervisors.  *See Santiago v. Warminster Twp.*, 629 F.3d, 121, 129 n.5 (3d Cir. 2010).  A supervisor can be liable if he or she "established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).  A supervisor can also be liable if he or she "participated in violating [the] plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Id.* (quoting *Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d at 586).  Simply alleging that supervisors had constructive knowledge by virtue of their role as supervisors is not enough.  *See Hasty v. County of Montgomery*, No. 12-cv-4335, 2014 WL 830282, at *7 (E.D. Pa. Mar. 4, 2014).

Parrish sufficiently alleges deliberately indifferent conduct by the DOC Defendants. Parrish asserts that he was diagnosed with glaucoma in both eyes in 2007. (Am. Compl. ¶ 26.) Glaucoma is an illness that can lead to blindness without proper treatment. (*Id.* ¶ 27.)  As

Parrish's condition worsened, the DOC Defendants failed to ensure that he was being provided proper medication and failed to schedule and/or take him to important follow-up appointments. (*Id.* ¶¶ 39–50.)  For example, the DOC Defendants failed to timely arrange for Parrish to have his sutures removed after his surgery.  (*Id.* ¶ 46.)  The delays in implementing treatment plans coupled with the prolonged delays in providing medication caused Parrish permanent and irreversible optic nerve and vision damage.  (*Id.* ¶ 55.)  These failures were in part due to non-medical considerations such as cost-cutting.  (*Id.* ¶¶ 19–20.)

Parrish alleges that "Wenerowicz was responsible for overseeing lower-ranking officers and formulating, implementing and overseeing prison policies, practices, and customs at Graterford, including the policies, practices and customs relating to medical care for inmates." (*Id.* ¶ 4.)  He alleges that Korszniak "was and is responsible for [overseeing] health care, . . . coordinating the professional medical staff in cooperation with the Corporate Defendants, . . . coordinating out-patient inmate treatment services and . . . scheduling transfer of inmates for the provision of out-patient medical and surgical services."  (*Id.* ¶ 14.)  Both Wenerowicz and Korszniak were responsible for responding to inmate grievances regarding their medical care. (*Id.* ¶¶ 14–15.)  In light of the allegations that both Korszniak and Wenerowicz knew of and denied Parrish's many complaints, Parrish has alleged deliberately indifferent conduct sufficient to survive a motion to dismiss.

### B.

Parrish also alleges that Corizon, Wexford and Correct Care ("the Corporate Defendants") were deliberately indifferent to his serious medical needs.  (Am. Compl. ¶¶ 58–66.) The Court treats private corporations providing medical care to prisoners as municipalities for purposes of a 42 U.S.C. Section 1983 analysis.  *See Natale*, 318 F.3d at 583 (analyzing a Section

1983 claim against a private corporation providing medical care in prisons under the *Monell* municipal liability standard).

Parrish alleges that the Doctors were employees of the Corporate Defendants during the relevant time periods. (Am. Compl. ¶ 9.) Generally, a municipality will not be held liable under the doctrine of *respondeat superior* for the misconduct of its employees. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). Rather, a municipality can only be liable under Section 1983 when a constitutional injury results from the implementation or execution of an officially adopted policy or informally adopted custom. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)). A successful *Monell* claim must therefore establish: (1) an underlying constitutional violation; (2) a policy or custom attributable to the municipality; and (3) that the constitutional violation was caused by the municipality's policy or custom.[2] *See Monell*, 436 U.S. at 658.

Parrish sufficiently alleges that he suffered an Eighth Amendment violation when the Doctors acted deliberately indifferent to his serious medical needs. *See supra* Part III.A.i. Parrish must also show that the constitutional violation is attributable to the municipality's policy or custom, and that the policy or custom actually caused the underlying injury. There are three situations where acts of a government employee may be attributable to the municipality under Section 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an

---

[2] The Corporate Defendants also contend that Parrish fails to allege the existence of a policymaker. At this early stage, however, Parrish "need not specifically identify the responsible decisionmaker, since practices that are considered custom or policy under *Monell* are ascribable to municipal decisionmakers." *Goldwire v. City of Philadelphia*, 130 F. Supp. 3d 936, 944 (E.D. Pa. 2015) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)); *see also Hasty v. County of Montgomery*, No. 12-cv-4335, 2014 WL 830282, at *4 (E.D. Pa. Mar. 4, 2014) (dismissing defendants' argument that failing to identify a specific policymaker's name renders a *Monell* claim insufficient, particularly where the well pleaded facts establish the existence of a policy that caused a constitutional injury).

implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Natale*, 318 F.3d at 584 (citations and internal quotation marks omitted).

Parrish alleges that the Corporate Defendants' failure to act in the face of obvious problems regarding the provision of medical care constituted deliberate indifference. Specifically, Parrish alleges that the Corporate Defendants: (1) failed to implement adequate review procedures; (2) failed to develop and implement procedures ensuring that the Doctors followed the outside specialists' treatment plans; (3) failed to adequately respond to inmate requests for treatment; (4) prevented inmates from receiving medication in a timely fashion for non-medical reasons; and (5) generally prioritized cost-cutting considerations over the health and safety of the inmates. (Am. Compl. ¶ 63.)

Taking Parrish's allegations as true, the inadequacy of the existing practices regarding the provision of medical care was obvious to the Corporate Defendants. For example, from 2007 to 2010 Parrish was prescribed Xalatan eye drops. (*Id.* ¶ 33.) After three years with the drops, Parrish was transferred to Virginia where doctors found his IOP to be at such "dangerously high levels" that they had to transfer him back. (*Id.* ¶ 35.) Though the Corporate Defendants eventually took Parrish to Wills Eye upon his return from Virginia, they failed to follow the treatment plans put in place by the specialists. (*Id.* ¶ 39.) They then terminated Parrish's treatment with Wills Eye despite the specialists directing that Parrish return in June 2011. (*Id.* ¶ 40.) By 2013—two years after Defendants ended his treatment with Wills Eye—Parrish's IOP "had increased from 9 to 26 in his right eye." (*Id.* ¶ 41.) Parrish therefore sufficiently alleges

that the Corporate Defendants were deliberately indifferent to the obvious needs presented by their inadequate policies regarding the provision of medical care.[3]

## IV.

Count IV of Parrish's complaint asserts medical malpractice claims against the Doctors and the Corporate Defendants. (Am. Compl. ¶¶ 84–88.) Count V alleges a claim for vicarious liability against the Corporate Defendants. (*Id.* ¶¶ 89–91.) The Doctors and Corporate Defendants argue that Parrish's state law claims must be dismissed because he failed to file certificates of merit under Pennsylvania Rule of Civil Procedure 1042.3.[4] Rule 1042.3 provides, in relevant part:

> (a) In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff . . . *shall file with the complaint or within sixty days after the filing of the complaint*, a certificate of merit signed by the attorney or party that either
>
> > (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or
> >
> > (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

---

[3] Defendants also assert that Parrish's claims are barred by the two-year statute of limitations that applies to claims under Section 1983 and Pennsylvania medical malpractice claims. "The limitations defense may only be raised on a motion under Rule 12(b)(6) 'where the complaint facially shows noncompliance with the limitations period and the affirmative defense [of the running of the statute of limitations] clearly appears on the face of the pleading.'" *Stewart v. Wenerowicz*, No. 12-cv-4046, 2015 WL 5092865, at *6 (E.D. Pa. Aug. 27, 2015) (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994)). As was the case in *Stewart*, the Court cannot determine at this stage whether Parrish could sustain his claims under a continuing violations theory. *See id.* "This denial is without prejudice to defendants' right to raise the statute of limitations defense by motion for summary judgment or at trial if warranted by the facts and applicable law." *Id.* at *7.

[4] Rule 1042.3 "is substantive law under the *Erie* Rule and must be applied as such by federal courts." *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011).

> (3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.
>
> . . .
>
> (d) The court, upon good cause shown, shall extend the time for filing a certificate of merit for a period not to exceed sixty days. The motion to extend the time for filing a certificate of merit must be filed on or before the filing date that the plaintiff seeks to extend. The filing of a motion to extend tolls the time period within which a certificate of merit must be filed until the court rules upon the motion.

PA. R. CIV. P. 1042.3(a), (d) (internal notes omitted). While Defendants are correct that certificates of merit are required, they fail to note that Parrish's original complaint did not allege claims of medical malpractice, or any claims against the Doctors generally. Rather, the original complaint alleged only Eighth Amendment claims against the DOC Defendants and Corizon. (*See generally* Compl., ECF No. 4.)

Pennsylvania courts have held that "the filing of an amended complaint does not afford the plaintiff an additional sixty days in which to file a certificate of merit." *O'Hara v. Randall*, 879 A.2d 240, 245 (Pa. Super. Ct. 2005). That rule only applies, however, where a plaintiff's "original complaint sounded in professional negligence." *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 326 (Pa. Super. Ct. 2007), *aff'd*, 17 A.3d 310 (Pa. 2011). Because Parrish's original complaint only alleged federal claims under Section 1983, it did not "sound[] in professional negligence" and the sixty-day window did not begin to run upon the filing of the original complaint.

Parrish filed his Amended Complaint with leave of Court on May 11, 2016. The Amended Complaint alleged, for the first time, medical malpractice claims against the Doctors and DOC Defendants. (*See generally* Am. Compl.) Parrish timely submitted his certificates of merit on July 7, 2016, before the sixty-day time period ended on July 10, 2016. (ECF Nos. 50–

58.) The Defendants do not contest the sufficiency of Parrish's state law claims and the Court thus need not address them; any arguments regarding their sufficiency have been waived.[5] *See, e.g.*, *Stewart v. Wenerowicz*, No. 12-cv-4046, 2015 WL 5092865, at *17 (E.D. Pa. Aug. 27, 2015) (denying defendants' motion to dismiss where defendants failed to address the sufficiency of the plaintiff's state law claims).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[5] Correct Care makes a passing argument that Parrish failed to allege that it had control over the Doctors for purposes of the vicarious liability claim. Parrish does allege, however, that the Doctors were employees of the Corporate Defendants and were responsible for implementing policies promulgated by those Defendants. (Am. Compl. ¶¶ 10–13.) These allegations sufficiently establish the control necessary for a vicarious liability claim. *See, e.g.*, *Milliner v. DiGuglielmo*, No. 08-cv-4905, 2011 WL 2357824, at *10 (E.D. Pa. June 8, 2011) (finding allegations that the individual medical defendants "were employed by . . . and acted within the scope of said employment" sufficient to survive a motion to dismiss).